No. 35,324

In the Matter of the Application of LLOYD FAIRCE for a Writ of Habeas Corpus. (LLOYD FAIRCE, *Petitioner,* v. MILTON F. AMRINE, Warden of the Kansas State Penitentiary, *Respondent.*)

(121 P. 2d 256)

Opinion filed January 24, 1942.

*Edwin J. Holman,* of Leavenworth, for the petitioner.

*Jay S. Parker,* attorney general, and *Jay Kyle,* assistant attorney general, for the respondent.

The opinion of the court was delivered by

HARVEY, J.: This is an original proceeding in habeas corpus. The petitioner alleged that he is being illegally held and deprived of his liberty by respondent under an unlawful judgment, sentence and commitment of the district court of Wyandotte county, which is repugnant to the United States constitution and bill of rights and void, for the reasons: (1) That he was denied benefit of counsel; (2) denied due process of law; (3) convicted on unsworn hearsay evidence; (4) forced to give testimony against himself; (5) that the rights to habeas corpus are inviolate; and (6) at no time did petitioner waive such rights. Attached to the petition as exhibits were an information filed in the district court of Wyandotte county by the county attorney which set forth facts charging the petitioner and one Clyde Williams with the offense of robbery in the first degree as defined by G. S. 1935, 21-527, on March 7, 1936, and copies of the court's journal of March 11, 1936, reciting that the county attorney, prosecuting for and on behalf of the state, and

defendant, Lloyd Fairce, in the custody of the sheriff but not represented by counsel, appeared in court, and the defendant was caused to stand and was duly arraigned to the charge in the information, and that he entered a plea of guilty; that he was caused to stand before the court, was informed of his plea of guilty and asked whether he had any legal cause to show why the judgment and sentence of the court should not be pronounced against him upon his plea of guilty, and no sufficient cause being alleged by defendant, or appearing to the court why that should not be done, the court proceeded to render judgment and sentence upon the defendant of confinement in the state penitentiary for a period of not less than ten years nor more than twenty-one years at hard labor. This is the sentence authorized by our statute, G. S. 1935, 21-530.

At the time of filing his petition the petitioner also filed a motion in which he asked the court to grant him such rights as are afforded a pauper; that the rule of the court with respect to costs be waived; that the court appoint counsel to defend his rights, and that a hearing be had upon his petition.

Upon examining the petition it was observed that grounds 3 and 4 of the alleged reasons for the invalidity of the judgment and sentence of the court were not pertinent, since no evidence was taken in the case, the defendant having pleaded guilty; that ground 5 simply stated a declaration, and that ground 6 was necessarily related to ground 1, and that the only fact alleged to support the general allegation that he was "denied due process of law" was the allegation that he was "denied benefit of counsel" without having waived it.

The court directed that the petition and accompanying papers be filed; waived its rules respecting deposit for costs and the printing of abstract and briefs, and required respondent to discharge the petitioner or to answer by a day stated and show cause why that should not be done. Respondent filed an answer which contained a general denial and specifically alleged that the petitioner is in the lawful costody of respondent by virtue of the judgment and sentence of the district court of Wyandotte county, which has not expired, and attached thereto a copy of the information filed against the petitioner and the record of the court showing his plea of guilty and sentence, and also attached a copy of a statement made by defendant on file in respondent's office which was taken March 9, 1936, by a stenographer and later transcribed, in the form of questions asked defendant by T. P. Palmer, a deputy county attorney, and answers made thereto.

The preliminary questions in the statement attached to the answer elicited the name and residence of defendant and that he was twenty-four years of age, and continued:

"Q. Now, Fairce, I want you to know that I am T. P. Palmer, deputy county attorney of Wyandotte county, and I will advise you at this time that any statement you make here may be used against you in the event of a prosecution. Now knowing this and being advised of this are you willing to make a statement? A. Yes, sir.

"Q. In your own words, Fairce, tell us from the beginning what occurred wherein Frank Oddo was taken in a car by you and Clyde Williams, and brought over to Kansas, and robbed of some money and jewelry? A. Well, this fellow pulled up to a stop light at Independence Avenue and Woodland [in Kansas City, Mo.]. We both got in the car and told him to keep on driving. I had a pistol.

"Q. Did you put it on him? A. I had it on my lap. I never did point it at him. He drove about 4 blocks and then Williams took the wheel. He sat in the front seat and I in the back seat, and he drove to Fairfax airport [in Kansas City, Kansas], and we made him get out of the car, and took his things.

"Q. Who robbed him? A. I robbed him.

"Q. What did you get from his person? A. I got a fountain pen and pencil, and a ruby ring, and a green hat, and a 15-jewel Elgin watch.

"Q. Is there anything else that occurred that you haven't told us? A. We got back in the car and drove off. He got out of the car and we got back in and left him go."

Fairce stated in answer to other questions that he took the automobile to a designated garage in Kansas City, Kan., which previously he had rented from a Mexican, whose name he did not know, removed from it the Missouri license plates and put on the Kansas license plates which he took from his own Ford car. He identified a certain .38-caliber revolver exhibited to him by Palmer as being the one he had with him that night; said it was loaded, and identified the loaded cartridges; stated he once was arrested at Stillwell, Kan., and convicted at Olathe, for grand larceny, and served from sixteen to eighteen months in the state reformatory at Hutchinson; that he was arrested in this case Sunday morning, March 8, and answered the following questions:

"Q. Now, Fairce, has anyone abused you or beaten you in any way to get you to make this statement? A. Not this one, no.

"Q. Has anyone promised you that you wouldn't be prosecuted if you made this statement? A. No.

"Q. Is this statement that you have made here the truth? A. It is the truth.

"Q. Have you made this statement here of your own free will and accord? A. Yes.

"Q. Now, Fairce, when these shorthand notes have been transcribed into typewritten form and you have had an opportunity to read this statement you have made here, and it is the same as you have made here, will you be willing to sign this statement? A. Yes."

This statement as transcribed was not signed by the petitioner.

In a reply to the answer of respondent the petitioner objected to this statement being considered, alleged he never signed it, and further alleged that he never had made the statement.

Having considered these pleadings, the court made the following order:

"The pleadings in the above matter present the following controverted issues of fact:

"1. Was the petitioner denied counsel in the trial court, and particularly at the time he entered his plea of guilty on March 11, 1936, to the crime of robbery in the first degree, referred to in the information and judgment of the court, copies of which are attached to the petition herein.

"2. Whether the petitioner, on or about March 9, 1936, made the statement to T. P. Palmer, deputy county attorney of Wyandotte county, in question and answer form, as set forth in the copy attached to the response in this case.

"The testimony or other evidence on those controverted issues will be heard by W. W. Harvey, a justice of this court, in the hearing room of the first division of the district court in the courthouse of Wyandotte county, Kansas, on Monday, October 27, 1941, at 10:30 o'clock a. m. Provision will be made for the petitioner to be present at this hearing. The petitioner and respondent are requested to advise the court, or Justice Harvey, at as early a date as possible, the names of witnesses for which they desire the court to issue subpoenaes. Justice Harvey has full authority to issue subpoenaes and in the interests of justice to change the time or place of hearing, or to adjourn the hearing from time to time."

The first of the controverted questions above stated is the only one having a direct bearing upon the right of the petitioner to be discharged by a writ of habeas corpus. The second was added because of the controversy concerning it which got into the pleadings, and this court felt interested to know the facts relating to it and give them such consideration as was proper in this proceeding. The case was set for hearing in the Wyandotte county courthouse because the court was informed witnesses would be available there and the expense and inconvenience of requiring them to come to Topeka would be avoided. The court appointed Hon. Edwin J. Holman, a capable, reputable attorney of Leavenworth, to represent the petitioner, furnished him copies of all pleadings, and directed him to confer with the petitioner prior to the date of hearing and prepare for the hearing on his behalf. This was done. To accommodate counsel and

witnesses the date of the hearing was changed to November 1, 1941, and was held on that date.

Present at the hearing were the petitioner, Lloyd Fairce; his attorney, Mr. Holman; his witnesses, Clyde Williams, who had been charged with the same offense in the indictment with petitioner and arrested with petitioner, and whose case had been handled much in the same way; and Williams' sister, Edna Campbell. The respondent appeared by Jay Kyle, an assistant attorney general, and presented as witnesses: Joseph Downs, one of the city detectives who arrested Fairce and Williams; Stanley Beatty, chief of police; T. P. Palmer, assistant county attorney, who interrogated Fairce on March 9, 1936, and handled his case in the district court; and Hon. Wm. H. McCamish, judge of the district court of Wyandotte county, division No. 3, for about twenty years, and who as such judge accepted Fairce's plea of guilty and pronounced judgment and sentence. We will summarize, or quote the testimony of these witnesses, grouping it as nearly as possible about each of the two controverted questions being considered.

Was the petitioner "denied benefit of counsel"? On this point the petitioner testified he was arrested about 7 o'clock Sunday morning, March 8, 1936, at 5½ Central apartment house, by city detectives Joe Downs and William McMullen (now deceased), and taken to the city jail; that he asked Downs "for a lawyer, and he said I didn't need one"; that about four o'clock in the afternoon he was taken to the finger-printing department and fingerprinted, at which time he asked for an attorney, asked "Mr. McMullens and Mr. Downs, I think. They were both there." Later he asked Mr. Palmer, assistant prosecutor, for counsel, "just before the judge passed sentence on me."

"Q. Did you ask the judge to appoint counsel for you? A. No.
"Q. Why not? A. Well, I figured Mr. Palmer would appoint counsel."

That Mr. Palmer "said I didn't need a lawyer." He made but one request of Mr. Palmer for a lawyer, "Just that one in the court room." He was sentenced the morning of the 11th day of March. The witness was arrested on a criminal charge in 1933 and tried in Johnson county. At that trial he was represented by an attorney he had not employed. "The court appointed me an attorney."

On cross-examination by Mr. Kyle:

"Q. Did Judge McCamish deny you counsel? A. Yes, sir.
"Q. Judge McCamish denied you counsel? A. He didn't give me counsel.

"Q. Did he deny you counsel? Answer my question. A. I would say he did; yes, sir."

Clyde Williams testified he was arrested at the same time the petitioner was and charged with the same crime. They were rooming together. On Sunday night he asked officer Downs for an attorney. A day or two after that he asked someone—he didn't remember who—for an attorney; it was in Mr. Beatty's office, but he was not sure that Captain Beatty was present. He was present when Lloyd Fairce was sentenced.

"Q. Did you, at that time, or did Fairce at that time, make a request for an attorney? A. I don't remember. . . .

"Q. Did Judge McCamish deny him counsel? A. I don't remember.

"Q. Did he ask for counsel? A. I don't remember that, either."

When the witness asked Downs for counsel on Sunday evening, March 8, "He said I didn't need none."

Edna Campbell, Clyde Williams' sister, knew both of the boys well; she was present when they were arrested on Sunday morning. That evening she tried to see them at the jail and was refused, by Captain Beatty, she thinks it was. The next morning, about ten or eleven o'clock, she tried to see her brother and was refused, by McMullen, she thinks it was. The next evening, Tuesday, she called to see her brother and was permitted to see both of them.

"Q. Did either of them ask you to hire an attorney for them? A. I asked Fairce and Williams both if they wanted me to get an attorney and they said they didn't think it would do any good."

After that she saw them practically every day. She was not present when they were sentenced.

On this point witnesses for respondent testified as follows: Joseph Downs, city detective: That he and McMullen arrested Fairce at eleven (not seven) o'clock on Sunday morning, March 8; that he did not "at any time, deny the right of counsel to them"; that he was not on duty that afternoon or evening and was not at the police station or jail; that he was present when Fairce was sentenced by Judge McCamish and "I heard Judge McCamish ask them if they wanted counsel before they were sentenced."

Stanley Beatty, captain of police: That he did not at any time deny the right of anyone to see either Fairce or Williams; he did not tell them they did not have the right of counsel; "that never was discussed"; that he did not deny them the right to visit with friends or relatives.

"There was no reason to deny that. We had certain visiting hours, Sundays and Thursdays, when friends and relatives come at this time, we permit them to get lawyers, . . . and this was Sunday evening. If any of their friends came and asked for them they were allowed to see them. They didn't ask for anyone to see them, and there was no calls for them. . . . Not while I was on duty."

He further testified officers Downs and McMullen were not on duty Sunday, March 8, in the afternoon or evening; other officers, Darnell and Hayes, were on duty at that time. Records of the police department as to officers on duty, introduced in evidence, were to the same effect.

T. P. Palmer, deputy county attorney, who handled the case of Fairce and Williams in the district court, was asked and answered the following questions:

"Q. Did you ever at any time deny the right of counsel to Fairce or anybody else? A. At no time when I was in the county attorney's office did I deny counsel to any defendant.

"Q. Were you present when Fairce was sentenced by Judge McCamish? A. I was.

"Q. Did Judge McCamish deny him counsel? A. I don't know that.

"Q. Judge McCamish didn't deny him counsel? That you know of? A. Didn't deny him counsel as far as I know. . . .

"Q. Did Judge McCamish ask either Fairce or Williams if they had counsel? Do you recall? A. I know this, in my experience, that not any of the courts have refused counsel to defendants, and in my experience, they were always asked if any of the prisoners wanted counsel. If they said they did, counsel was given them. They had an opportunity to get lawyers.

"Q. That was the general practice when Judge McCamish was on the bench and you were in the county attorney's office? A. That was my experience for six years."

Hon. William H. McCamish, the judge of the district court who sentenced Fairce to the penitentiary and Williams to the reformatory, was asked:

"Q. Did you deny either Fairce or Williams the right of counsel in the proceeding, Judge? A. I can only speak from experience, but I can say positively that I never denied any man counsel who requested it, either by me or in my presence, and there was no deviation from the practice that a prisoner was asked whether he had already employed counsel or if he wanted and cared to employ counsel, and as I say, I positively never refused a man counsel or indicated he would not need it or if there were any circumstances where I believed he should have counsel. I can recall that Mr. Williams at the time wanted to go to the penitentiary because he had a cousin up there, instead of to the reformatory, and he was accommodated, but afterwards he was sent to the reformatory. . . . I followed it religiously, I might say.

. . . Throughout my term of service, and especially when the police officers brought them in to plead guilty. I had them properly arraigned—all the formalities, and asked them if they had any reasons to give the court why sentence should not be pronounced. I strictly adhered to the criminal code, and the interpretations of the supreme court so far as I could understand them."

Regarding the statement attached to the answer of respondent the petitioner testified: That he did not make a statement to the county attorney confessing to the alleged crime; that between the time he was arrested on Sunday morning and the following Wednesday he was interviewed by the county attorney.

"He asked me my name and where I lived, and several questions. I don't remember all of them now.

"Q. What was the nature of those questions? A. They were pertaining to the robbery charge and I don't remember what all of them were, but the statement, I didn't make that statement."

That during the interview he did not acknowledge ownership of any pistol or revolver, or any cartridges that might fit it, but was shown a revolver.

"He asked me if that was my revolver. Said they got it out of my apartment."

There were present at the interview Joseph Downs, Mr. Palmer and some lady. She was writing on a piece of paper.

"Q. Were you told at that time that you were making a statement, and that such statement that you might have made would be used against you, or could have been used against you? A. That is what he said.

"Q. You were informed of that fact? A. Yes, he said anything I said would be used against me."

He was told the statement he was making would be taken in shorthand and transcribed, and that he was to read the statement after it was typewritten; that he was asked to sign the statement after he was sentenced, and that he refused to do so.

"I told them that the statement wasn't true. That I didn't make that statement that he had typewritten off.

"Q. What parts of that statement you were asked to sign were not true? A. Pertaining to robbing that man. Those statements were not true."

Concerning that, Mr. Palmer testified that he took the statement, and—

"I have seen the answer, and I would say that the statement was taken as incorporated in your answer."

He testified he did not recall whether the petitioner was asked to sign the statement—

"But I can explain there were a lot of statements that were not signed because they would not sign them, refused to sign them, or the notes of the statement were transcribed after they were probably sentenced, and maybe they did not have an opportunity."

Officer Downs testified that he had read the statement filed as a part of the answer taken in his presence on March 9—

"Q. Is it, to the best of your recollection, a true statement of what took place there? A. Yes, sir."

The testimony of the stenographer who took and transcribed the statement was not available.

During the course of his examination the petitioner was asked and answered the following questions:

"Q. Were you asked by the court whether or not you had anything to say before you were sentenced? A. No, sir.

"Q. Was there any communication between you and the judge when you were sentenced? A. No, sir."

He further testified that prior to his sentence he was not presented with a copy of the complaint or information, and did not see it. On cross-examination he was asked if the complaint or information wasn't read to him in open court, and answered that "The judge read something off."

"Q. When was it read off? A. It was in the court.

"Q. Was it before Judge McCamish? A. Yes."

At the close of the testimony counsel for petitioner, at his request, was given thirty days in which to file a brief. The brief for the petitioner has been filed; also a brief for respondent, and the cause is submitted to the court upon the pleadings, evidence and briefs.

Our reaction to the witnesses, as we saw them and heard them testify, may be stated as follows: The petitioner Fairce is a well-developed, aggressive young man with a weakness of moral fiber, but far from being devoid of good. Had his qualities of integrity and industry been developed he might have been a leader in a business or profession. Perhaps it is still not too late, if a favorable opportunity were given him. He freely admitted he did not ask Judge McCamish to appoint counsel for him, and that Mr. Palmer, the deputy county attorney, told him that any statement he made at questioning might be used against him; yet "he would say" the court

denied him counsel and that "he did not say" some of the things written in his statement to the county attorney. He testified there was no communication between him and the judge when he was sentenced, but on cross-examination admitted "the judge read something off"; obviously the "something" was the information. He also testified he was not asked whether he had anything to say before he was sentenced; this is contrary to the journal of the court and to other evidence. Naturally, he is anxious to be liberated from imprisonment, and while not willing or ready openly to perjure himself, was bent on coloring the facts and blaming someone, or anyone, for the predicament in which he finds himself.

Clyde Williams is a hunchback, with the lack of aggressiveness common to such persons; the kind of boy who would follow or go along with a more active, aggressive person like Fairce. As a witness, obviously he endeavored to be truthful. He did not remember that either he or Fairce asked Judge McCamish for counsel, or that Judge McCamish denied counsel to either of them. Likewise, Edna Campbell gave the impression of a witness who desired to be truthful. She was friendly to Fairce, her brother's roommate, and anxious to be of help to both of them. Her testimony is that she talked with Fairce and Williams the evening before they were sentenced, asked them if they wanted her to try to get them an attorney, "and they said they didn't think it would do any good."

There is no reason to discount the material testimony of any of the witnesses called by respondent. Captain Beatty and Mr. Downs appear to be capable officers who devote their time to the study of crime and apprehending criminals, and who, realizing they are likely to be called as witnesses, make notes or charge their minds with pertinent facts pertaining to a case. Mr. Palmer appears to be a quiet, capable attorney who wastes no time in nonessentials. Nothing in his manner, conduct or testimony indicates he would take undue advantage of anyone charged with crime. Judge McCamish is a capable attorney and was an able judge, familiar with our constitution and statutes and disposed to conform with them. He is the author of a work on Kansas Forms in general use by the bench and bar of the state, and is the type of man who always disciplined himself to conduct his court business in harmony with our constitution, our statutes, our court decisions and the natural and inherent rights of litigants. The fact that Mr. Palmer and Judge McCamish spoke of their uniform practice in cases of this character rather than from

their detailed recollection of the Fairce case does not weaken their testimony. In the course of the years of their service they had many cases in which the procedure was somewhat similar. Unless there was some unusual feature it is likely they would not remember details of the case five years after it was handled. Judge McCamish did remember the one unusual feature that Williams requested to be sent to the penitentiary because he had a cousin there rather than to the reformatory, and later changed his mind. In other respects the case was handled as all such cases were handled and in a manner which fully complied with the law.

In the conduct of the trial of one charged with crime under the laws of this state the court, the prosecuting attorney and defendant are governed by our constitution and statutes. Under our constitution (Bill of Rights, § 10) an "accused shall be allowed to appear and defend in person, or by counsel," and to be tried by a jury. These are privileges which may be waived. (*In re Mote*, 98 Kan. 804, 160 Pac. 223; *Loftis v. Amrine*, 152 Kan. 464, 105 P. 2d 890.) Our statute then in force (G. S. 1935, 62-1304, since amended by Laws 1941, ch. 291, § 1) required the court to assign counsel to an accused "at his request." There is no evidence in this case that the petitioner requested the court to assign to him counsel. On the other hand, there is positive evidence that the court advised him of his right to be represented by counsel and inquired of him if he desired counsel. We discredit the testimony of the petitioner that just before he was sentenced he asked the deputy county attorney, Mr. Palmer, for counsel, for the reason that this testimony is controverted, and for the further reason we believe from the evidence that had such a request been made it would have been complied with. Also we discount his statement that he thought the county attorney was the proper person to whom to make his request rather than the court, for the reason that this business was not new to him. Only three years before he had been charged with a felony in an adjoining county and had a trial in the district court, where the court, Judge Roberds, appointed counsel for him. In addition to that it seems clear from all the evidence that he did not think it would do any good for him to have counsel. He had so stated to Edna Campbell the evening before he was called upon to plead to the information.

We pause to observe that the petitioner has reason to be grateful to the trial court, and particularly to the county attorney, by reason of the fact they chose in his case not to invoke the statute (G. S.

1935, 21-107a) which authorized a double penalty because of his prior conviction of a felony.

Upon the question, which is altogether of secondary importance in this case, the court, considering the evidence, finds that the petitioner made the statements attributed to him in the examination conducted by the deputy county attorney, a transcript of which was set out as a part of the response in this case. In his testimony he admitted much of it, but denied that he had made the statements about the robbery. Naturally that was the thing being inquired about. There is no reason under the evidence in this case for a finding that the stenographer who took and transcribed the statement either took this testimony falsely or made a false transcript of it. There is substantial evidence to the contrary. There is nothing in this record tending to show that the county attorney, or his deputy, or the court, at any time took any undue advantage of the petitioner or made any false records respecting his case.

We discover nothing in the record tending to show that defendant has been denied counsel, or due process of law, as those terms are used in the federal constitution. The petitioner makes no serious contention that such a showing has been made. It is argued on behalf of the petitioner that he had no counsel at his preliminary examination. We agree that it may be important to an accused that he have counsel at every stage of the prosecution. No issue was made on this point by the pleadings, hence evidence was not directed specifically to it. Such evidence as there is in the record pertaining to it indicates that he made no request for counsel at that time. Apparently he waived his right to counsel then, as he did later in the district court.

The writ prayed for is denied.